458 A.2d 940

**Robert B. SURRICK, Plaintiff,**

v.

**Honorable J. Sydney HOFFMAN, Defendant.**

Supreme Court of Pennsylvania.

Argued April 19, 1983.

Decided April 27, 1983.

Robert B. Surrick, Media, pro se, Robert P. Cummins, pro-hoc-vice, Chicago, Ill., for plaintiff.

Stephen M. Feldman, Philadelphia, for defendant.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## ORDER

PER CURIAM:

No merit having been found in plaintiff's objections to the unanimous order of the full Court dated January 26, 1983, the complaint in quo warranto is dismissed and judgment entered in favor of defendant.

NIX, J., files a dissenting opinion in which McDERMOTT, J., joins.

534

NIX, Justice, dissenting.

Under Article 5 of the Constitution of this Commonwealth, as amended in 1968, the Chief Justice and Justices of this Court were vested with the awesome responsibility of exercising the "supreme judicial power of the Commonwealth." Pa. Const., Art. 5, § 2. The magnitude of this charge necessarily mandates circumspect exercise of that power. Thus, whenever a legitimate question is appropriately raised regarding the propriety of our discharge of this responsibility, it is incumbent upon this Court to assess the complaint, without rancor, with reflective objectivity and to confess error where appropriate. The arrogant misuse of public trust is the precursor of tyranny. To obstinately refuse to admit error and to perpetually seek justification is to deny the fallibility of human nature and to assume a posture that is indefensible. It is for these reasons that I believe it is incumbent upon me to acknowledge error in my previous vote and explain the basis for that conclusion.

At issue is the legality of this Court's order of January 26, 1983 appointing a retired judge to serve as one of the two members representing the Superior Court on the Judicial Inquiry and Review Board (Board). Pa. Const., Art. 5, § 18. The constitutional question raised is whether a judge who has attained the mandatory retirement age and retires in accordance with constitutional mandate can serve as one of the two representatives of the Superior Court on the Board. I am constrained to conclude that a retired judge is not a judge of the Superior Court within the meaning of section 18(a) and therefore is ineligible to serve.[1] This conclusion is not altered, in any respect, by the fact that the judge may have been temporarily assigned to the Superior Court by order of this Court pursuant to section 16(c) of Article 5. As

1. Section 18(a) provides:
   (a) There shall be a Judicial Inquiry and Review Board having nine members as follows: three judges of the courts of common pleas from different judicial districts and two judges of the Superior Court, all of whom shall be selected by the Supreme Court; and two non-judge members of the bar of the Supreme Court and two non-lawyer electors, all of whom shall be selected by the Governor.

reluctant as I am to reach this result because of my affection and respect for Judge Hoffman, the judge appointed in this instance, I must accept the clear mandate of Article 5.

## I.

The fatal flaw in any argument seeking to suggest that section 16(b) of Article 5 supports the instant appointment is the refusal to recognize that the mandatory retirement provision of section 16(b)[2] extinguishes the status of judge and creates a vacancy which must be filled by the provisions of section 13 of Article 5. This inescapable fact, which is unequivocally established by the plain meaning of the language of the entire Article, forces the conclusion of the constitutional invalidity of the appointment.[3] The support-

2. Section 16 provides:
> § 16. Compensation and retirement of justices, judges and justices of the peace
>
> (a) Justices, *judges* and justices of the peace shall be compensated by the Commonwealth as provided by law. Their compensation shall not be diminished during their terms of office, unless by law applying generally to all salaried officers of the Commonwealth.
>
> (b) Justices, *judges* and justices of the peace shall be retired upon attaining the age of seventy years. *Former and retired* justices, *judges* and justices of the peace shall receive such compensation as shall be provided by law. No compensation shall be paid to any justice, judge or justice of the peace who is suspended or removed from office under section eighteen of this article or under article six.
>
> (c) A *former or retired* justice or *judge* may, with his consent, be assigned by the Supreme Court on temporary judicial service as may be prescribed by rule of the Supreme Court.
> (Emphasis added.)

From the language above and throughout Article 5, it is evident that the drafters took great care in distinguishing between active judges on the one hand and former and retired judges on the other. In instances where the drafters intended to refer to retired and former judges, they did so *explicitly*. The absence of such a specific reference in section 18(a) is a telling argument which cannot be ignored.

3. It is a basic precept of constitutional interpretation that constitutional provisions must be read in the popular, ordinary and natural sense the ratifying voter gave them. *Commonwealth ex rel. Paulinski v. Isaac*, 483 Pa. 467, 397 A.2d 760 (1979); *Berardocco v. Colden*, 469 Pa. 452, 366 A.2d 574 (1976); *Commonwealth v. Harmon*, 469 Pa. 490, 366 A.2d 895 (1976); *Commonwealth v. Russo*, 388 Pa. 462, 131 A.2d 83 (1957).

ers of the appointment can only justify their interpretation of section 16(c) by refusing to read that paragraph in context with the other provisions of the section, particularly 16(b), and by ignoring the obvious scheme of the entire Article. Such an interpretation requires the total disregard of the well-established tenets employed to determine constitutional mandate and frustrates the will of the electorate of this Commonwealth who adopted this Article.[4]

## A.

To sustain the position of the supporters of the appointment we are literally called upon to totally emasculate mandatory judicial retirement. The singular thesis of the constitutional arguments attempting to sustain the appointment's validity requires the unjustified assumption that section 16(c) in some way mysteriously resuscitates and brings new life into the status of a retired judge. Although they begrudgingly concede, as they must, some diminution in the status of the retired judge,[5] they ignore the clear constitutional scheme to extinguish the status and create a vacancy when the retirement occurs. *See Barbieri v. Shapp,* 476 Pa. 513, 523, 383 A.2d 218, 223 (1978) ("When [a judge] leaves office because his term ends . . . by the attainment of the constitutionally prescribed retirement age—a new judge

4. Related constitutional provisions must be read together in order to properly ascertain their meaning. *Cavanaugh v. Davis,* 497 Pa. 351, 440 A.2d 1380 (1982); *Berardocco v. Colden, supra; Weiss v. Ziegler,* 327 Pa. 100, 193 A. 642 (1937). Because the Constitution is an integrated whole, effect must be given to all of its provisions whenever possible. *Cavanaugh v. Davis, supra; Cali v. Philadelphia,* 406 Pa. 290, 177 A.2d 824 (1962). When faced with two interpretations of the same provision, the court must favor a natural reading which avoids contradictions and difficulties in implementation, completely conforms to the intent of the framers and reflects the views of the ratifying voter. *Zemprelli v. Daniels,* 496 Pa. 247, 436 A.2d 1165 (1981); *Commonwealth ex rel. Paulinski v. Isaac, supra.*

5. The defendant bases his concession, that a senior judge is not a member of the court to which he is assigned for purposes of internal administration, on the definition of "Judge" in the definitional section of the Judicial Code, 42 Pa.C.S. § 102. He maintains, however, that a senior judge, upon assignment, becomes a judge for all other purposes.

is to be elected for a new term."); *DiNubile v. Kent,* 466 Pa. 572, 575, 353 A.2d 839, 841 (1976) ("Because the attainment of age seventy before [a judge's] term as a member of the judiciary would otherwise end ends the term, there is no 'unexpired portion of his term.'"); *Firing v. Kephart,* 466 Pa. 560, 567, 353 A.2d 833, 836 (1976) ("The intent of the framers clearly was that [mandatory retirement] would cause a vacancy to occur and the previous term to expire.").

The mandatory retirement provision of section 16(b) represents a policy determination made by the framers of the Constitution and embraced by the electorate of this Commonwealth. In that section the delegates addressed the problem posed by judges who remained on the bench after their faculties had become impaired by advanced age or some mental or physical disability.[6] It was recognized that imposing retirement at age 70 would force many still competent judges to assume retired status, and that the availability of those competent retired judges, willing and able to serve, would be a valuable resource in alleviating *occasional* court congestion and delay. To reach this objective, the drafters of the Judiciary Article made provision in section 16(c) for temporary post-retirement service.[7]

Section 16(c) authorizes this Court to assign a former or retired judge to temporary judicial service. Prerequisite to such a temporary assignment is a showing by the president judge of the requesting court that additional judicial assistance is "necessary and proper for the prompt and proper disposition of the business of the court." Pa.R.J.A. 701(d).

6. *See* Judiciary Subcomm. of the Preparatory Comm. for the Pennsylvania Constitutional Convention, Reference Manual No. 5 (1968) at 199–216.

7. It must be emphasized that the regular complement of active judges in any given court or judicial district is based upon a legislative determination as to the manpower needed to properly manage the normal case flow of that court or district. *See* 42 Pa.C.S. §§ 541, 561 and 911(a). Thus, the use of the additional manpower supplied by former and retired judges is only for the unusual situation and is not to be considered a permanent supplement to the regular complement of judges within a court or district. *See* Pa.R.J.A. 701(d), (e) and (f).

It is clear, therefore, that even the temporary utilization of a former or retired judge is appropriate only where necessitated by the unexpected increases in case inventories of a particular court or within a given judicial district. The intention of the framers, acknowledged by this Court in promulgating Pa.R.J.A. 701, was to permit able former and retired judges to preside over cases where needed. It is obvious that there was no intention of reinstating any retired judge to his or her former status. Rather, it provided a vehicle for a pool of additional judicial manpower on a special need basis.

To postulate that the language of that section confers upon a retired judge a status virtually equal to that of an active judge for constitutional purposes requires the preposterous assumption that the framers would provide for mandatory retirement in one subsection and abolish it in the next. Failure to recognize the qualitative difference between the constitutionally prescribed roles of active and retired judges renders the entire concept of mandatory retirement illusory. Personal opinion that mandatory retirement is either unfair or not needed is of no consequence. It in no way dilutes the obligation of this Court to carry out a clear constitutional mandate. Article 5 represents an unequivocal expression of the citizens of Pennsylvania that mandatory retirement is to be an integral part of the judicial scheme. Until this expression is altered through the amendment process, it remains the will of the people and may not be eroded through Court interpretation.

### B.

Additionally, acceptance of this interpretation of parity between judges and former and retired judges frustrates the purposes of the retention election provisions of the Article. Like mandatory retirement, the concept of a nonpartisan retention election after ten (10) years of service was another one of the innovative procedures first adopted in the 1968 amendment. The voters in this Commonwealth have demonstrated a strong desire to maintain an elective judiciary.

Thus, the retention election serves to some degree to negate the partisan aspect of that process and yet, conforms to the public's wish for accountability of the persons serving on the bench throughout this Commonwealth.[8] After gaining judicial office by partisan election, the judicial officer is required under section 15 to have his or her judicial performance reassessed after *each* succeeding ten year term of service.[9] Where the judicial officer declines to stand for retention a vacancy in that office occurs. *Walsh v. Tucker,* 454 Pa. 175, 312 A.2d 11 (1973).

Article 5 makes no provision for voter assessment of the performances of former or retired judges assigned to temporary judicial service. This deliberate omission further reflects the constitutional intent that future judicial service by former or senior judges is not to be continuous or of long duration. If a judge after retirement is permitted to serve on an equal footing with active judges, the public will be deprived of its jealously guarded right to periodic scrutiny of sitting judges. Should the instant appointment be sustained, a retired judge who last ran for retention in 1975 will serve on the Board until 1987. For a period of eleven (11) years he will be authorized to exercise the judicial power of the Commonwealth, free from accountability to the electorate. Retention is the device that permits public accountabil-

**8.** The importance of this provision is that it preserves voter accountability achieved through an election, while enhancing the independence of the judiciary by removing the partisan aspect. A statement made by Delegate Burkholder during the Constitutional Convention is illustrative:

> The sub-committee on tenure discussed this matter very carefully and was almost unanimously of the opinion that in order to preserve and implement the sitting judge principle, the merit retention plan—that is the "yes-no" vote—should be adopted. If the pressures that can rise against a judge—which are of a political nature—are to be mitigated or reduced, then the "yes-no" vote is the way to remove those pressures.

II Debates of the Pennsylvania Constitutional Convention of 1967–1968 (1969) at 1081.

What was clearly rejected was life tenure after the initial election.

**9.** The only exception to this requirement is that section 15(a) sets the term of office of the judges of the Municipal and Traffic Courts of Philadelphia at six (6) years. The retention requirement for those judges is otherwise identical.

ity after each ten (10) years of service. Thus, the urged interpretation not only contravenes the intent of the framers but also disenfranchises the electorate.

## C.

There is another equally fundamental reason why the urged interpretation must be rejected. The unavoidable implication of such a reading of section 16(c) is that this Court possesses an unrestrained and unlimited power to create and fill the office of judge. Such an implication finds no justification in the language of Article 5, nor is it consistent with any known system of government. It is clear under the Constitution that judgeships not provided by Article 5 were to be created by the legislature. Article 5, § 8.[10] It is equally apparent, and so held by this Court, see, e.g., Cavanaugh v. Davis, 497 Pa. 351, 440 A.2d 1380 (1982); Barbieri v. Shapp, 476 Pa. 513, 383 A.2d 218 (1978); Leedom v. Thomas, 473 Pa. 193, 373 A.2d 1329 (1977), that judges can only be selected under the provisions of Article 5, § 13. To draw from the language of Section 16(c) by implication this extraordinary power creates an anomaly totally inexplicable under well accepted tenets of constitutional construction.

Section 16(c) must be construed in light of the other provisions of the article in the form in which they were drafted at the time of the adoption of the article. At the time of adoption, section 3 expressly provided that the Superior Court "shall consist of seven judges." [11] Thus, the reference in section 18(a) as to "two judges of the Superior Court" must necessarily have referred to the Superior Court as defined in section 3. This would preclude any suggestion that section 16(c) implicitly authorized an expansion of the then prescribed seven-judge court for purposes of compliance with section 18(a).

10. Article 5, § 8 reads:
   The General Assembly may establish additional courts or divisions of existing courts, as needed, or abolish any statutory court or division thereof.

11. A constitutional amendment to Art. 5, § 3, adopted November 6, 1979, was required to empower the General Assembly to enlarge the Superior Court beyond seven judges.

## II.

Analysis of the nature of the responsibilities of the Board under section 18 further supports the view that section 16(c) was not intended to permit a retired judge to be eligible for such service. Prior to the adoption of the 1968 amendment, the suspension or removal of a judicial officer was a function performed by the legislative branch of government through the impeachment process,[12] or by the legislative and executive branches through the process of address.[13] Although in part adjudicative in character, the discipline of judges has historically been a legislative and/or executive function as opposed to being "a judicial service."

The 1968 amendment creating the Board did not alter the nature of this disciplinary function. To the contrary, the clear constitutional intent was to create a disciplinary body, distinct from and independent of the unified judicial system,[14] to ensure its objectivity and impartiality in the discharge of its responsibilities.[15]

**12.** Article 6, §§ 4, 5 and 6 (formerly sections 1, 2 and 3) of the Constitution of 1873. Corresponding provisions in prior Constitutions were:

Constitution of 1838, Art. 4, §§ 1, 2 and 3; Constitution of 1790, Art. 4, §§ 1, 2 and 3; Constitution of 1776, § 22.

**13.** Article 5, § 15 of the Constitution of 1873 provided for removal by the "address" (less than impeachment) of two-thirds of each House of the General Assembly. "Address" is "a procedure whereby the Governor removes the offending judge on the address of one or both houses of the legislature." Judicial Subcom. of the Preparatory Comm. for the Pennsylvania Constitutional Convention, Reference Manual No. 5 (1968) at 162. Although there was some question as to whether the "address" process applied to judges of the Supreme Court, it explicitly applied to all other judges required to be "learned in the law."

**14.** The Board is not one of the specifically enumerated components of the unified judicial system. Section 1 provides:

**Unified judicial system**

The judicial power of the Commonwealth shall be vested in a unified judicial system consisting of the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal and traffic courts in the City of Philadelphia, *such other courts* as may be provided by law and justices of the peace. All courts and justices of the peace and their jurisdiction shall be in this unified system. (Emphasis added.)

**15.** The intense discussion during the Constitutional Convention of 1967–1968 regarding the inclusion of non-judge members of the bar

The composition of the Board prescribed in section 18(a) manifests the intention of the framers to maintain its perceived and actual independence and integrity. The Board is to consist of two laymen and two lawyers of the Pennsylvania bar, to be selected by the Governor, as well as five judges, three from different courts of common pleas and two from the Superior Court, to be chosen by the Supreme Court. This aim is further manifested in the continuity of membership ensured by the drafters, by the creation of fixed four year staggered terms, Art. 5, § 18(b); Art. 5, Schedule, § 24, and in the requirement that a member can only be removed within the term upon a showing of good cause, Art. 5, § 18(b).

of the Supreme Court and non-lawyers in the composition of the Board illuminates the grave concern that members of the Board be accountable to the public. Delegate More gave an impassioned plea:

> The present proposal provides for a judicial inquiry and review board made up of five judges, two lawyers and two non-lawyer members. We believe that every segment of society should be represented on this board. Though the judges should be the majority in a board like this, they certainly should have the benefit of the advice of both men in the legal profession and laymen. I say that if we adopt this amendment and compose the board of five judges, we are emasculating this particular section and I think we are doing great harm to the entire area of removal, suspension and discipline.
>
>      \*    \*    \*    \*    \*    \*
>
> It is extremely important that both lawyers and laymen have a distinct say in the operation of this committee. I cannot express how strongly the entire committee felt about this particular area.

II Debates of the Pennsylvania Constitutional Convention of 1967–1968 (1969) at 1108.

Delegate Barry's statement on the floor of the Convention also expresses the concerns of the delegates in adopting section 18:

> We feel that if a man should be tried by his peers, a judge should be tried ultimately by judges but the public, besides the judges, has an interest in this board and should be represented; the legal profession has an interest; laymen have an interest.
>
>      \*    \*    \*    \*    \*    \*
>
> We feel that the hearings that will be held by this board will be few in number, but, if you have a board composed entirely of judges, you are going to have ... some difficulty because of the fact that only judges are represented and *the people will ask what you are doing.*

*Id.* (Emphasis added.)

The Board is properly viewed as an entity equivalent to an administrative agency independent in the performance of its area of responsibility. The Board possesses investigatory, prosecutorial and adjudicative powers.[16] It is therefore clear that its function is totally distinct from the "judicial service" rendered by the unified judicial system. Thus the reference in section 16(c) to the use of former and retired judges performing "temporary judicial service" provides no authorization for former and retired judges to serve on the Board.

Most importantly, we cannot blur the distinction between the power to appoint members to the Board under section 18(a) and our power of assignment of judges, within the judicial system, under section 10(a).[17] The power to assign in order to implement judicial administration is a distinctly different function derived from a separate constitutional source from the power to appoint members of the Board under section 18(a). Not only is the undertaking of the duties and responsibilities of membership on the Board separate and distinct from the performance of "judicial services" within the unified judicial system, appointment for a fixed term of four years is obviously not the "temporary" service envisioned under section 16(c).[18] Such an absurd interpretation cannot be seriously pressed. *See Commonwealth ex rel.*

16. *See* Art. 5, § 18(e), (f) and (g).

17. The power to assign "on temporary judicial service" is to be read in conjunction with the explicit power to assign under section 10(a). In both cases the power to assign refers to courts. In neither instance should the power to assign be confused with the power to appoint members to the Board under section 18(a). We are afforded wide discretion in our powers to assign judges to courts. We are carefully limited in our power of appointment to the Board. The judicial districts from which the judges of the courts of common pleas are to be selected must be different; the number of appointments are restricted; succession after four years is prohibited but for a lapse of one year and appointments may be made by this Court only from judges of the common pleas courts and the Superior Court. Consequently, the broad power to assign judges to courts on which they are not serving an appointive, elective, or retentive term cannot support the exercise of the power to appoint *from a particular court* one who is not serving an appointive, elective or retentive term on that particular court.

*Specter v. Vignola,* 446 Pa. 1, 285 A.2d 869 (1971); *Garratt v. Philadelphia,* 387 Pa. 442, 127 A.2d 738 (1956); *cf.* 1 Pa.C.S. § 1922(1).

## III.

For the foregoing reasons it should be clear that regardless of Judge Hoffman's particular expertise in this area and his previous meritorious service on this Board, the instant appointment is constitutionally proscribed. To yield to the temptation of bending clear constitutional mandate, even where the motive is laudable, sets precedent for an erosion that will undermine our entire system of justice. This expression of my opinion is not in any way to be viewed as denigrating the value and the need for the pool of judicial manpower supplied by former and retired judges. I am fully cognizant of the high quality of judicial service rendered by our former and senior judges, on many occasions without compensation and often at great personal sacrifice and inconvenience. My dissent is compelled nonetheless because as valuable as this asset is to the system, it can only be used in accordance with constitutional direction. The will of the people as to how their government should function must be paramount.

McDERMOTT, J., joins in this dissenting opinion.

18. In fact the Constitution provides for a four year term for, *inter alia,* the Governor and Lieutenant Governor (Art. 4, §§ 3, 4) and members of the Senate (Art. 2, § 3). Further, all executive appointees serve four year terms. Act of April 9, 1929, P.L. 177, art. II, § 208, *as amended,* 71 P.S. § 68 (1962 and Supp.1982–83).